Filed 6/11/14  P. v. Cho CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B245008 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA348160) |
| v. | |
| TONY CHO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Modified and, as modified, affirmed with directions.

David Andrew Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

———————

1

Appellant Tony Cho appeals from the judgment entered following his conviction by jury of first degree murder (Pen. Code, § 187) with personal use of a knife (Pen. Code, § 12022, subd. (b)(1)), personal use of a dumbbell (Pen. Code, § 12022, subd. (b)(1)), and personal and intentional discharge of a firearm causing great bodily injury or death (Pen. Code, § 12022.53, subd. (d)).  The court sentenced appellant to prison for 51 years to life.  We modify the judgment and, as modified, affirm it with directions.

## FACTUAL SUMMARY

1. *People's Evidence.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established in October 2008, Laura Sueoka was the girlfriend of Dong Shin (the decedent).  The two frequently exchanged text messages on their phones.  At 7:44 p.m. on October 20, 2008, Shin texted Sueoka, inter alia, he was watching a movie with a friend.  She replied, telling Shin to text her after Shin's friend left.  After additional texts, Sueoka, at 12:45 a.m. on October 21, 2008, texted Shin goodnight.  At 12:47 a.m., he replied.

Shin lived on the first floor of an apartment complex on South Oxford in Los Angeles.  Sung Yun lived on the second floor.  Between midnight and 1:45 a.m. on October 21, 2008, Yun was awakened by sounds of fighting and arguing coming from Shin's apartment.  Yun testified she heard three bangs and, a little later, something very heavy fall.  After three or four minutes of silence, Yun heard a ringing sound as if something was falling, then heard someone turning on the shower.  The shower was running perhaps four minutes.  About 10 to 20 minutes passed from the time Yun awoke to the time it was quiet.

Sueoka awoke the morning of October 21, 2008, and tried to contact Shin throughout the day to no avail.  About 8:12 p.m. on October 21, 2008, Sueoka went to Shin's apartment and knocked on his door, but no one answered.  Later, a female assistant of the apartment manager let Sueoka inside Shin's apartment.  Sueoka saw

2

blankets piled on the floor. She had been in the front living room on prior occasions and appellant had kept it neat. Sueoka called the police.

About 8:30 p.m. on October 21, 2008, Los Angeles Police Detective John Shafia entered Shin's apartment. Shafia testified he found cocaine, four to five pounds of marijuana, and narcotics ledgers in the apartment. Shafia found no money except for a few coins. According to Shafia, Shin was one step above a street dealer. A bullet casing was in the living room.

Shin's apartment appeared to have been ransacked. Cabinet doors, and drawers, were open, and their contents had been slid to the side. Shafia saw "every storage possibility was open . . . [and] the closet doors were open." Items apparently had been removed from the drawers, and piles of clothes were on the floor. The kitchen and a bedroom had been similarly ransacked.

Shin, deceased, was in the bathroom. Shafia saw no blankets covering Shin's body but Shafia had seen photographs depicting Shin initially covered by blankets. The glass on the shower's sliding glass door was smashed. Blood was on the bathroom walls, blood was splattered up the walls towards the ceiling, and pools of blood were on the bathroom floor. Dumbbells (depicted in a photograph, i.e., People's exh. No. 53) were next to Shin's head. Bullet holes were in back of the shower tile, and bullet fragments were mingled with broken glass in the bathtub. A bullet casing was beneath the sink vanity.

Shafia testified each of the two bedrooms in Shin's apartment had an old window with a very thin, old, aluminum frame. Each window had a middle movable pane with a screen. The panes were very thin. There was nothing unusual about the borders of either window. Each window was very dusty, and neither had fingerprints, marks, or pry marks. The screens on each window could not be removed because the thumb tabs for each screen were missing.

Surveillance video depicted Shin leave his apartment at 12:18 a.m. on October 21, 2008, and permit appellant to enter the apartment complex. Appellant later admitted to

3

Shafia video depicted appellant entering Shin's apartment. When appellant entered, he was wearing a dark T-shirt, blue jeans, and sandals. Shafia testified video depicted appellant carrying a duffel bag.

Video depicted appellant leaving Shin's apartment at 1:44 a.m. on October 21, 2008, and wearing a brown hat or brown cap, dark shirt, dark jeans, and sandals. Appellant was carrying a duffel bag over his right shoulder, and was holding in his left hand a large, clear, wadded plastic baggy. Appellant had a cell phone in his right hand. After the videos depicted appellant leaving, they did not depict anyone enter Shin's apartment until two ladies entered that evening. Los Angeles Police Detective Salvador Loera testified there were four surveillance cameras at the complex and the fourth, which was not working, was 'point[ed] towards the rear of the building toward the parking lot."

The People presented evidence appellant, using Shin's cell phone, called Sueoka's cell phone and, as a ruse, indicated Shin had stolen something from certain persons who, as a result, were holding Shin for ransom. Police officers pretending to be Sueoka communicated with the caller, who, between 9:57 p.m. on October 21, 2008, and 3:00 a.m. on October 22, 2008, told the officers to go to various locations including Third and Vermont, Sixth and Wilshire, Wilshire and Normandie, and a 7-Eleven at Sixth and Alexandria. Los Angeles Police Detective Ron Kim testified appellant's apartment was very close to the 7-Eleven.

At one point during the communications, the caller said, "Honestly my personal advice, don't show. Forget Don and try to move on with your life." The caller also said, "Don tried [to] rip off wrong guys and now they want shit before they let him go." (*Sic*.) The caller further said, "I'll call you at 1:30. Answer your phone. If no answer, I leave message, then throw away phone."

The caller later personally called and said he would be wearing a brown cap, cutoff shirt, and khaki shorts at the 7-Eleven. About five minutes later, police saw appellant there and he matched the description. He had a soda in his hand. A marked police car drove past appellant and he removed his cap, picked up a pack of Coke from

4

the ground, and began walking. Police arrested appellant. Appellant was wearing men's Adidas sports sandals (People's exh. No. 87) that appeared to have bloodstains.

On October 22, 2008, Kim interviewed appellant at the police station and appellant told Kim the following. About midnight, appellant went to Shin's apartment because appellant owed him money for a gambling bet.[1] Appellant was wearing a T-shirt, blue jeans, and slippers, and had a backpack. When appellant arrived, he had diarrhea and was in the bathroom for almost an hour. After leaving the bathroom, appellant conversed with Shin, then left. Appellant was in the apartment about an hour and 30 minutes. Appellant did not pay the debt he owed to Shin. Appellant went home, then went to a 7-Eleven for a pack of Coke.

At some point Kim told appellant he was under arrest for homicide. Kim told appellant there were video cameras at Shin's apartment complex. Appellant said he did not know this. Kim showed appellant a photograph of someone entering or leaving the complex. Appellant asked if Kim thought the photograph depicted appellant and if appellant was being accused of murder.

Kim left, returned, and told appellant he was being charged with homicide. Appellant asked to speak with an attorney and Kim left. Appellant later told Kim appellant wanted to speak off the record with Kim. After Kim told appellant that Kim could not speak off the record, appellant conversed with Kim. During the conversation, Kim told appellant police found Shin's DNA on one of appellant's slippers. Appellant replied that earlier in the morning he had fought with Shin in Shin's apartment. Appellant said he could talk about himself but not about others, this was how the game was played, and he knew the risks when he signed up. Kim testified appellant told Kim that if Kim had photographs, Kim should have "[appellant] coming out and then [Kim] should have [appellant] going through earlier that day."

---

[1]     Shafia testified appellant told Shafia appellant went to Shin's apartment to pay a $4,500 debt.

Shafia testified at appellant's October 2012 trial that at an April 2012 proceeding, appellant changed his story from what appellant had told Kim. At the April 2012 proceeding, appellant testified that, because Shin was paranoid about using and selling drugs, Shin wanted appellant to exit the apartment by using an emergency rope ladder to climb out a back window. However, Shafia had processed the crime scene at Shin's apartment and had found no such ladder.

Shafia searched the trunk of appellant's BMW M5 car and found a kitchen knife. The knife was eight inches long and one and a half inches wide. Shafia found in the back of appellant's car a duffel bag that was the same color as the one the video depicted appellant carrying when he entered and left Shin's apartment. That duffel bag contained cocaine. Shafia found in appellant's bedroom a duffel bag and a plastic bag. At trial the prosecutor, apparently pointing to a photograph, asked if Shafia found anything in "that bag" and Shafia indicated he found in it a cocaine brick. Shafia found in appellant's home additional cocaine and a large bag containing marijuana. Shafia also found methamphetamine, drug paraphernalia, baggies, a cell phone, and a digital scale.

The parties stipulated (1) "People's 87, an Adidas sandal" had blood evidence, and a drop of blood, on the sandal, (2) swabs were taken from "People's 53, two dumbbells," and (3) the blood evidence from the sandal, and the swabs from the two dumbbells, were submitted to Cellmark for analysis.

Kelli Byrd, a Cellmark DNA analyst, testified that unless Shin had an identical twin, a DNA profile obtained from the swab sample of the red stain on the sandal originated from Shin. The probability a random Asian in North America could have had that profile was one in 18.3 quadrillion. Byrd analyzed four swabs taken from the handle of the dumbbells. Each of two provided partial DNA profiles consistent with Shin's DNA profile. The other two yielded inconclusive results. Cellmark did not routinely concentrate DNA from partial samples from the Los Angeles Police Department, and did not do so as to the above four swabs.

6

Vadims Poukens, a deputy medical examiner, conducted an autopsy on Shin and determined Shin had been shot 15 times throughout his body.[2] This included five gunshot wounds to Shin's right hand and three to his left hand. The gunshot wounds to the hands were nonfatal defensive wounds.

Poukens also testified as follows. Shin suffered five, fatal, blunt force trauma head injuries. The resulting wounds ranged from oval to semi-circular in shape and caused fractures at the base of Shin's skull. The circular head wounds were consistent with round, metal dumbbells. Shin also had been stabbed three times in his left back. Each stab wound was one and a half inches wide. Stab wound No. 1 was six inches deep and stab wound Nos. 2 and 3 were each four inches deep. All three stab wounds could have been inflicted by a kitchen knife eight inches long and one and a half inches wide, and that width perfectly matched the skin wounds. The gunshot wounds and blunt force head injuries occurred while Shin was alive. The stabbings occurred last, and after Shin had no blood pressure or pulse. Poukens's sense was Shin was already dead when the stabbings occurred.

2. *Defense Evidence.*

In defense, appellant testified as follows. Appellant had nothing to do with Shin's death. Appellant and Shin were good friends and appellant had known Shin 10 years. During that period, appellant had bought marijuana from Shin and, during the last five years, appellant had bought cocaine and ecstasy from him. In October 2008, appellant drove a 2007 BMW M5. At 11:00 a.m. on October 20, 2008, appellant went to Shin's apartment to buy a pound of marijuana from him. Shin had promised to have the

---

[2] Bullet No. 1 entered Shin's nose. Bullet No. 2 entered Shin's chin. Bullet No. 3 grazed Shin's chin. Bullet No. 4 was fatal, entered Shin's right flank, and proceeded right to left, and down. Bullet No. 5 entered the back of Shin's right arm and exited its front. Bullet No. 6, rapidly fatal, entered Shin's right lower back and stopped in his chest. Wound No. 7 entered the posterior surface of Shin's right thigh and exited its front.

7

marijuana but ultimately did not have it. Appellant left, promising to return for the marijuana.

At 12:18 a.m. on October 21, 2008, appellant entered Shin's apartment. No one else was there but Shin. The previously identified Adidas sandals belonged to appellant but he was not wearing them. Appellant was wearing Birkenstock sandals. Appellant bought from Shin a pound of marijuana for $4,500. Appellant was at the apartment a total of about 20 minutes, then left. Appellant left through Shin's bedroom window in the back of Shin's apartment. Appellant used an emergency rope ladder, connected to the top of a headboard, to leave. Shin, on the bed, used one hand to hold the screen door out, and the other hand to keep the ladder steady. Appellant testified he truthfully told Kim appellant was wearing the same clothes when he entered and left Shin's apartment.

Appellant was later at the 7-Eleven and wearing a two-tone hat. Appellant testified "[i]t had kind of mesh in the back that was kind of brown and then in the front was beige, maybe off-white." Appellant was at the 7-Eleven perhaps 30 minutes and smoking cigarettes before police arrested him. Appellant did not remember removing his hat. Appellant believed police were arresting him for failing to appear in court, and later thought he was in custody for possessing narcotics because he possessed cocaine, methamphetamine, oxycotin, and ecstasy in his duffel bag in his car.

The duffel bag appellant took into Shin's apartment and the duffel bag in appellant's car were the same. The knife in the trunk of appellant's car was a kitchen knife he had possessed since 2005 when he was studying to be a sushi chef. The knife had been in his trunk since 2008.

During direct examination, appellant's counsel asked appellant why a drop of Shin's blood was on appellant's sandals. Appellant testified as follows. Appellant and Shin previously had bled on each other numerous times. The two would use cocaine until their noses bled. The two were injured during sports, including during softball, and appellant and Shin would "patch" each other up. Softball was a noncontact sport, but

8

appellant had bled more playing softball than he had playing any other sport. Appellant testified he really did not know how to answer his counsel's question.

Appellant provided false information to Kim about appellant's home address because appellant's house was full of drugs. Appellant provided false information about the identity of the registered owner of his car because his home address was listed on the car's registration. When appellant finally believed Kim when Kim said Shin was dead, appellant began babbling. Appellant testified that, because of the babbling, he began lying "to cover up what I had already unintentionally said." Appellant lied when he had said that, when he was at Shin's apartment, he was in the bathroom with diarrhea for over an hour. Appellant lied when he said he went to Shin's apartment because appellant owed a gambling debt. Appellant never told Kim appellant fought Shin. Appellant vaguely remembered telling Kim appellant and Shin had argued before, but that was the only thing Kim and appellant talked about relating to fighting.

Jessica Bickham, a DNA analyst, received from Cellmark two DNA extracts reflecting a swab from the dumbbells. Bickham concentrated the extract and generated a DNA mixture originating from at least three persons. At least one of the persons was a male. Shin was a possible contributor to the DNA. Bickham excluded appellant as a possible contributor. A toxicologist testified there was evidence Shin had used cocaine before he died and was under the influence of marijuana when he died.

Sun Kim, who managed the apartment complex where Shin lived, testified that in October 2008 there were eight security cameras in the apartment complex, including the camera pointed at the back windows of Shin's apartment. A photograph depicted four cameras. Sun Kim was not sure a photograph depicted a camera looking at the back windows of Shin's apartment. Sun Kim did not know why that particular camera was not working. As far as he knew, all of the security cameras were working on October 21, 2008. Sun Kim arrived at the apartment complex at 7:00 a.m. on October 21, 2008, and detectives were reviewing video when he arrived. Sun Kim did not know what was happening with the cameras before he arrived.

9

*ISSUES*

Appellant claims (1) the trial court erroneously instructed on first degree felony murder, (2) the trial court erroneously instructed on first degree premeditated and deliberate murder, (3) insufficient evidence supports his first degree murder conviction, (4) the trial court erroneously failed to instruct the jury to rely only on the court interpreter's English translations of testimony, (5) cumulative prejudicial error occurred, and (6) Penal Code section 1170.1, subdivision (f) requires that the Penal Code section 12022, subdivision (b)(1) enhancement for appellant's use of a dumbbell be stayed.

*DISCUSSION*

1. *Sufficient Evidence Supported the First Degree Felony Murder Instruction.*

Appellant claims the trial court[3] erred by instructing on first degree felony murder with robbery as the predicate felony. Appellant argues "there was no proof appellant had the intent to rob Shin when the murder was committed or that the murder was committed for the purpose of taking any property." We reject the claim.

a. *There Was Substantial Evidence Appellant Killed Shin.*

Appellant concedes "an argument ensued [in Shin's apartment] while [appellant] was there," "appellant . . . had an argument with [Shin]," and Shin died "within at most a few minutes after the argument." Appellant also concedes there was substantial evidence appellant was aware of the murder.[4]

Moreover, we have recited pertinent facts in our Factual Summary. They include the texts between Sueoka and Shin, the testimony of Yun concerning what she heard in Shin's apartment, the video evidence appellant entered and exited Shin's apartment, and Shafia's testimony about the condition of the back windows and the absence of a ladder

---

[3] This was appellant's second jury trial. The first ended in a mistrial after the jury hopelessly deadlocked 11 to 1 for conviction.

[4] Appellant asserts, "the only inference supported by the evidence was that appellant took . . . [Shin's cell phone] to help him *cover up* the murder by employing a ruse that Shin had been kidnapped." As later discussed, we conclude there was substantial evidence appellant not only covered up the murder but committed it.

10

in Shin's apartment. If video depicted appellant exiting a back window, the jury reasonably could have expected appellant to present that video as logical defense evidence. The jury reasonably could have concluded the killer was the person whom the video depicted leaving the apartment, and appellant's testimony about leaving through a back window was fabricated to avoid a conclusion he was the person depicted in the video.[5]

Appellant effectively concedes he took Shin's cell phone and used it to call Sueoka as previously discussed (see fn. 4, *ante*). Police found in appellant's car a kitchen knife the width of which matched the width of Shin's knife wounds. Shin's DNA was found in the blood on one of appellant's sandals. The jury reasonably could have concluded appellant ran water in Shin's shower to wash blood off himself and the knife. The jury reasonably could have concluded much of appellant's statements to police and testimony at trial was self-serving and fabricated. Appellant had a motive to kill Shin; to steal Shin's narcotics and/or to retaliate for appellant's "rip[ping] off [the] wrong guys." (*Sic*.) We conclude there was sufficient evidence appellant killed Shin.

b. *There Was Substantial Evidence Appellant Killed Shin During a Robbery.*

Moreover, as discussed below, there was substantial evidence appellant killed Shin to rob him. According to Shafia, the apartment had been ransacked by someone looking for something. The jury reasonably could have concluded appellant ransacked the apartment immediately after fatally assaulting Shin, i.e., the jury thus reasonably could have concluded appellant killed Shin to ransack the apartment with intent to rob him.

Shin's apartment contained narcotics, including four to five pounds of marijuana, and including cocaine. Appellant ultimately testified he bought a pound of marijuana, but the jury was free to accept or reject his testimony in whole or in part. The jury

---

[5] As mentioned, appellant told Kim that if Kim had photographs, Kim should have "[appellant] *coming out* and then [Kim] should have [appellant] going through earlier that day." (Italics added.) Appellant said nothing in that statement about climbing out a back window.

11

reasonably could have concluded, in light of all the evidence, appellant stole the pound of marijuana and robbed Shin of it. Appellant testified he paid $4,500 for the pound of marijuana but, except for a few coins, Shafia found no money in Shin's apartment.

Our Supreme Court has observed, " '[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' [Citations.] 'If a person commits a murder, and after doing so takes the victim's wallet, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money.' [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 187.) There was evidence the pound of marijuana was substantial property (appellant claimed he paid $4,500 for it) and murders are also commonly committed to obtain drugs. The jury reasonably could have concluded much of appellant's statements and testimony were fabricated to mask his intent to rob Shin.

According to appellant, the duffel bag he took into Shin's apartment and the duffel bag later found in appellant's car were the same. This permitted the inference appellant was carrying that duffel bag when he left Shin's apartment. Shafia testified he found cocaine in the duffel bag in appellant's car. The jury reasonably could have concluded that, just as appellant had stolen the pound of marijuana, appellant stole from Shin's apartment the cocaine found in appellant's duffel bag in his car. Appellant's theft of the pound of marijuana was evidence of a common design or plan to take (and thus evidence he took) narcotics, including the cocaine, as well as evidence of intent to steal the cocaine from Shin and to commit robbery. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2, 403.) Appellant also took Shin's cell phone from Shin's apartment (a fact appellant concedes) and took a plastic baggy.

The jury reasonably could have concluded appellant killed Shin with intent to commit robbery, and in fact robbed him of the pound of marijuana, the cocaine in the duffel bag in appellant's car, Shin's cell phone, and the plastic baggy. Finally, appellant texted De Oca (who was pretending to be Sueoka), "Don tried [to] rip off wrong guys."

12

(*Sic*.) The jury reasonably could have concluded appellant's implied claim Shin tried to steal from the wrong guys and, in retaliation, the latter were holding Shin (who in fact was dead) for ransom was a ruse to mask the fact appellant killed Shin to steal from him and rob him. Accordingly, appellant told Sueoka to forget Shin and move on with her life. There was substantial evidence appellant killed Shin during a robbery. The trial court did not err by instructing on felony murder under the theory the felony was robbery.

2. *Sufficient Evidence Supported the First Degree Premeditation and Deliberation Instruction.*

Appellant claims the trial court erred by instructing on first degree premeditated and deliberate murder. He argues there was insufficient evidence of premeditation and deliberation.[6] We reject the claim.

We incorporate here our analysis in part 1 of our Discussion, *ante*. Moreover, there was substantial evidence as follows. Whether or not appellant was Shin's friend, appellant knew from past purchases of drugs from Shin that Shin was a drug dealer who had drugs in his apartment. On October 21, 2008, appellant had a gun and kitchen knife in Shin's apartment. After a verbal dispute between appellant and Shin, appellant shot him. The bullet casing in the living room, and the scene in the bathroom, provided evidence the killing began in the living room and continued to the bathroom. Appellant shot and bludgeoned Shin to death in close quarters in the bathroom, and stabbed him.

Appellant shot Shin 15 times, including shots to Shin's head and torso. During this time, appellant was shooting Shin at close range, shooting Shin's hands while Shin was trying to defend himself. Appellant switched to a dumbbell he used to deliver multiple fatal blows to the back of Shin's head.

---

[6]    "Deliberate" means arrived at as a result of careful thought and weighing of considerations for and against the proposed course of action, and "premeditated" means considered beforehand. (*People v. Perez* (1992) 2 Cal.4th 1117, 1123.) "Premeditation and deliberation do not require an extended period of time, merely an opportunity for reflection." (*People v. Cook* (2006) 39 Cal.4th 566, 603.)

13

Appellant stabbed Shin three times in the back after Shin was dead. Appellant told De Oca (who was pretending to be Sueoka), "Don tried [to] rip off wrong guys." (*Sic*.) The jury reasonably could have concluded as follows. Appellant went to Shin's apartment as part of a premeditated plan that included killing Shin and robbing him of drugs. That plan included appellant stabbing Shin in the back to indicate the "guys" whom Shin allegedly "tried [to] rip off" were sending a message in retaliation for the figurative backstabbing those "guys" had received when Shin allegedly tried to steal from them. Appellant, pursuant to his preexisting plan, ransacked the apartment to steal from it, and ultimately stole the items previously discussed. Appellant's numerous fabrications in this case were an effort to conceal his premeditated, deliberate intent to kill Shin to rob him.

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court " 'identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing.' [Citation.] However, these factors are not exclusive, nor are they invariably determinative. [Citation.] ' "*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]" ' [Citation.]" (*People v. Combs* (2004) 34 Cal.4th 821, 850.)

In the present case, the evidence of planning activity, motive, and the manner of killing provided evidence of premeditation and deliberation. The fact the slaying was unusually brutal or the fact the slaying involved multiple wounds could not alone support a determination of premeditation, but brutality can be indicative of calculated violence in context (*People v. Turner* (1990) 50 Cal.3d 668, 688, fn. 4) and there was evidence of such calculated violence here. There was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, appellant killed Shin with premeditation and

deliberation and therefore committed first degree murder.  The trial court did not err by instructing on first degree premeditated and deliberate murder.[7]

3.  *The Trial Court Did Not Erroneously Fail to Instruct Regarding the English Translation of Testimony.*

Yun, and Na Youn, were People's witnesses at trial.  Youn was Yun's sister and lived with Yun.  The testimonies of Yun and Youn were similar.  Sun Kim was one of appellant's witnesses at trial.  Jenny Kim (Jenny), a court interpreter who represented that her oath was on file, translated the testimony of Yun, Youn, and Sun Kim from Korean into English.  The trial court failed to instruct the jury to rely on Jenny's English translations instead of the witnesses' testimony in Korean.

Appellant claims the trial court's failure was error.  We disagree.  There is no dispute Jenny properly performed her duty as an interpreter and accurately translated the testimony of Yun, Youn, and Sun Kim from Korean into English.  (Evid. Code, §§ 664, 751, subd. (a).)  There is also no dispute the jury understood English (see Code Civ. Proc., § 203, subd. (a)(6)) and heard and understood Jenny's English translations.

As appellant concedes, when a tape is in a foreign language, the English translation controls and is the evidence of what was said.  (*People v. Cabrera* (1991) 230 Cal.App.3d 300, 304.)  Similar reasoning applies here.  When testimony is in a foreign language, the English translation controls and is the evidence of what was said.  The court, in its final charge to the jury, gave CALCRIM Nos. 200, 220, 223, and other instructions which told the jury to rely on the evidence.  We presume the jury followed those instructions (cf. *People v. Sanchez* (2001) 26 Cal.4th 834, 852) and therefore relied on Jenny's English translations.

---

[7]      Appellant's third contention, that insufficient evidence supports his first degree murder conviction, essentially reiterates his instructional sufficiency arguments and there is no need to address them further.

15

Moreover, the burden is on appellant to demonstrate error from the record; error will not be presumed. (*In re Kathy P.* (1979) 25 Cal.3d 91, 102; *People v. Garcia* (1987) 195 Cal.App.3d 191, 198.) Further, a trial court has no duty to give unnecessary instructions. (Cf. *People v. Schultz* (1987) 192 Cal.App.3d 535, 539.) Appellant has failed to demonstrate any juror understood the Korean language.[8] Appellant therefore has failed to demonstrate any juror was capable of relying on the three witnesses' testimony in Korean.

Appellant cites no published case holding that a trial court has a duty to instruct that the jury must rely on a court interpreter's English translation of testimony, and that such a duty exists even when there is no evidence any juror understood the foreign language the interpreter translated. Appellant has failed to demonstrate it was necessary to instruct the jury to rely on Jenny's English translations. No instructional error, or violation of appellant's confrontation right, occurred.

Even if one or more jurors understood the Korean language and the trial court committed the alleged instructional error, appellant has failed to demonstrate any juror understood any testimony in Korean differently than the English translations on any matter (of consequence or not). No prejudicial instructional error occurred under any conceivable standard. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)[9] None of the cases cited by appellant compel a contrary conclusion.

---

[8]     Appellant suggests we may infer it is reasonably probable one or more jurors understood the Korean language given certain alleged demographic facts pertaining to the location of the trial court in this case. Appellant, in a request for judicial notice filed on April 30, 2013, asked that we take judicial notice of those alleged demographic facts. However, on May 21, 2013, we denied said request for judicial notice; therefore, we do not consider the alleged demographic facts. Even if we had considered them, they would not have altered our analysis.

[9]     In light of our above analyses, we reject appellant's claim cumulative prejudicial error occurred.

16

4. *Imposition of the Penal Code Section 12022, Subdivision (b)(1) Enhancement for Appellant's Use of a Dumbbell Must Be Stayed.*

The trial court imposed a Penal Code section 12022.53, subdivision (d) firearm enhancement of 25 years to life, plus a one-year Penal Code section 12022, subdivision (b)(1) enhancement based on appellant's use of a dumbbell during the murder. Appellant claims imposition of the one-year enhancement was an unauthorized sentence because, as between the two enhancements, Penal Code section 1170.1, subdivision (f) requires imposition of only the greater section 12022.53, subdivision (d) enhancement.

Imposition of both enhancements was authorized. (Cf. *People v. Crites* (2006) 135 Cal.App.4th 1251, 1255-1256.) The proper procedure was to stay execution of the section 12022, subdivision (b)(1) enhancement. (*Crites,* at pp. 1255-1256.) We will modify the judgment accordingly.

### *DISPOSITION*

The judgment is modified by staying execution of the one-year Penal Code section 12022, subdivision (b)(1) enhancement previously imposed by the trial court based on appellant's use of a dumbbell during the murder, pending completion of his remaining sentence, such stay then to become permanent, and, as modified, the judgment is affirmed. The trial court is directed to forward to the Department of Corrections an amended abstract of judgment reflecting the above modification.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

We concur:


KLEIN, P. J.


ALDRICH, J.


18